**Lord v. SSA**                                   **CV-99-409-B    07/27/00   P**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE


**Richard Lord**

    **v.**                                    Civil No. 99-409-B
                                                  Opinion No. 2000 DNH 170

**Kenneth S. Apfel, Commissioner,**
    **Social Security Administration**


## MEMORANDUM AND ORDER

Richard Lord seeks review of a final decision of the Commissioner of the Social Security Administration ("SSA"), denying his application for disability insurance benefits for the closed period beginning August 16, 1990 and ending December 31, 1995.[1]  I have jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g) (1994).  Before me are Plaintiff's Motion for Order to Reverse the Decision of the Commissioner (Doc. #7) and Defendant's Motion for Order Affirming the Decision

---

[1]  The former date is when Lord claims that his disabling impairment began; the latter is when his insured status expired. See Tr. at 200.  ("Tr." refers to the certified transcript of the record submitted to the Court by the SSA in connection with this case.)

of the Commissioner (Doc. #10), as amended (Doc. #11).  For the reasons that follow, I reverse the Commissioner's decision and remand for further proceedings in accordance with this memorandum.

## I.  Background

The relevant procedural and factual background of this case, as described in the joint statement of material facts provided by the parties (Doc. #9),[2] is as follows:

### A.  Procedural History

Lord filed his current application for disability insurance benefits in April 1994.[3]  After the SSA denied Lord's application initially and upon reconsideration, Lord requested a hearing before an Administrative Law Judge ("ALJ").  On June 12, 1995, ALJ Frederick Harap denied Lord's application, finding that

---

[2]  Unless otherwise noted, the procedural and factual background set forth in this memorandum and order derives from the joint statement submitted by the parties.

[3]  Lord made an earlier application for disability insurance benefits in July 1991, which forms no part of the basis for the current appeal.

during the relevant period Lord remained able to perform a full range of light and sedentary work despite having a severe chronic back condition.  <u>See</u> Tr. at 23.

On January 31, 1997, the SSA's Appeals Council denied Lord's request for a review of the ALJ's decision, thus rendering the ALJ's decision the final determination of the Commissioner.  <u>See</u> <u>id.</u> at 6.  Lord then filed a timely action in this court, seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  On July 14, 1998, I remanded the case to the SSA (1) to determine whether (and/or to what extent) Lord's limited ability to bend at the waist significantly impacted his capacity to perform the full range of light work, and if necessary (2) to obtain expert vocational testimony as to what jobs, if any, Lord could perform given his bending limitation.  <u>See</u> <u>Lord v. Apfel</u>, C-97-505-B, slip op. at 28-29 (D.N.H. July 14, 1998).[4]  In my July 14 memorandum and order, I also determined that substantial

_____

    [4]  My previous opinion in this case is reproduced at pages 254-82 of the transcript.

evidence in the record supported the ALJ's decisions regarding how much weight to give the opinions of Lord's various doctors and Lord's complaints of pain. See id. at 17-26. On August 29, 1998, the Appeals Council remanded the case to an ALJ for further proceedings consistent with my memorandum and order.

In November 1998, ALJ Ruth Kleinfeld conducted a new hearing in this matter, at which Lord and a vocational expert (VE) testified. On May 27, 1999, the ALJ issued a decision denying Lord's application. In her decision, the ALJ found that although Lord's ability to perform light work was limited by restrictions on stooping, working at unprotected heights, and working around vibration, he was nonetheless able to perform a significant number of light and sedentary jobs. See Tr. at 205, 208-12. Lord then filed the present action for review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).[5]

_____

[5] According to the SSA's regulations, an ALJ's decision on remand becomes the final decision of the Commissioner, and is thus subject to judicial review unless the Appeals Council assumes jurisdiction over the case. See 20 C.F.R. § 404.984(a) (1999). Because there is no indication in the present record

-4-

**B.    Summary of Facts**

Lord was 48 years old when his insured status expired on December 31, 1995. He left school in the eighth grade, but later earned a GED (sometime around 1997). He previously worked in housing maintenance, both at an apartment complex and most recently at a mobile home park. His duties included caring for buildings and grounds, plowing snow, shoveling, digging ditches, and repairing broken equipment. Lord has not worked since August 16, 1990, the date that he claims his disability began.

**1.    Medical Evidence Prior to December 31, 1995**

On August 16, 1990, Lord twisted his back while descending backwards off of a ladder. Complaining of stiffness in his lower back, he visited the emergency room at a local hospital on August 20, 1990. At that time, he was prescribed an anti-inflammatory agent and a muscle relaxant, and was referred to an orthopedist.

that the Appeals Council asserted jurisdiction over the case after ALJ issued her decision on remand, the ALJ's decision became final decision of the Commissioner and I have jurisdiction to review it pursuant to 42 U.S.C. § 405(g).

Pursuant to that referral, Lord was examined by Dr. Jamie Smolen on August 27, 1990. Lord complained of pain and stiffness in his lower back and stated that the pain increased with bending in all directions. He also complained of a limited range of motion. At that examination, Lord performed prone press-ups and abdominal curls with no problem. His heel and toe walking, hopping, reflexes, motor examination, and straight-leg raising were all normal.

At a follow-up visit on September 17, 1990, Lord continued to complain of pain, but also noted that it had decreased and that his flexibility had increased. Dr. Smolen started Lord on back-strengthening exercises. Dr. Smolen subsequently noted that over the next several weeks, Lord's condition improved with exercise and that he experienced less pain. Despite the progress, Dr. Smolen suggested that Lord remain out of work until his condition further improved.

After a December 19, 1990 office visit, Lord continued to complain of lower-back pain and stated that he had difficulty

sitting, bending, twisting, and turning.  Testing showed that the strength of Lord's back muscles had decreased since the previous testing.  Examination revealed discomfort with bending, knee to chest flexion, abdominal curl, and prone extension.  Dr. Smolen indicated that Lord should not return to work.  A subsequent MRI revealed a large herniated disk at L5-S1 and a bulging disk at L4-L5.  As a result of the MRI, Dr. Smolen referred Lord to Dr. Jonathan Sobel for a surgical consult.

Lord complained to Dr. Sobel of severe pain in his lower back, left buttock, and left leg as well as difficulty moving.  Dr. Sobel found "mild" nerve root tension and "slightly" deep tendon reflexes at the ankle and discussed surgical options with Lord.  A subsequent CT scan confirmed Lord's herniated and bulging disks.  When compared to the previous MRI, the CT scan results showed no significant worsening and even slight improvement.

On May 10, 1991, Lord visited Dr. Anthony Marino for a second opinion on surgery.  At that examination, Lord noted pain

in the left buttock and occasional numbing of the left foot, but also noted intermittent improvement. Lord also stated that physical therapy provided "some relief." Dr. Marino noted that Lord moved about the examination room and stood on one leg, his heels, and his toes, all without difficulty. Dr. Marino concluded that surgery might help to relieve Lord's leg pain.

On June 20, 1991, Lord reported to Dr. Sobel that he had been told to "take it easy for the summer" and that he was "doing quite well after a period of rest." Dr. Sobel was of the opinion that Lord should be vocationally retrained. In July 1991, Lord entered a work hardening program. Though Lord complained of pain following therapy, Dr. Sobel attributed this pain to Lord's "sedentary" lifestyle. In September 1991, Lord expressed his desire to remain in physical therapy and to return to light duty work. Dr. Sobel noted "[t]hat will be fine."

After an October 10, 1991 examination, Dr. Sobel noted that residual functional capacity testing indicated that Lord could perform medium to heavy work. Unable to square these results

with Lord's continued complaints of pain, Dr. Sobel recommended more objective testing. On January 13, 1992, Dr. Sobel noted that Lord's flexibility and leg pain had improved and that he required paraspinal muscular strengthening. Dr. Sobel referred Lord to Dr. Smolen to pursue this program.

Dr. Smolen reported on January 30, 1992, that Lord was no longer having leg pain and that his back was "simply achy, stiff and sore." Lord reported that he was comfortable leading a sedentary, low activity lifestyle. Although examination revealed "slightly limited and slightly uncomfortable" back bending, Lord performed toe and heel walking, hopping, and abdominal curls all without difficulty. Dr. Smolen recommended against surgery and suggested that Lord should continue in physical therapy.

Lord next visited Dr. Smolen nearly a year later, on January 21, 1993. Lord complained of lower-back pain and discomfort performing activities around the house as well as those related to sitting, standing, bending, twisting, and turning. Examination revealed that Lord was able to slowly and cautiously

bend toward the floor, reaching below the level of his knees. His back extension was limited and uncomfortable, although straight-leg raising tests, reflexes, motor strength, and sensory examination were all normal. Dr. Smolen recommended continued physical therapy.

Over the next few months, Lord's condition remained unchanged and he continued to complain of lower-back pain and stiffness. On April 8, 1993, Dr. Smolen stated that he believed Lord was unable to return to work. Dr. Smolen further noted that he expected "that realistically [Lord] will not return to work until his [Worker's Compensation] case is settled." Additionally, Dr. Smolen noted that Lord "will remain partially and permanently disabled. He will never be able to perform a job that requires repetitive twisting, turning, lifting, carrying, or bending. . . . He will always be at a light duty work capacity, if he ever works again." Dr. Smolen then referred Lord to Dr. John Thomas for more physical therapy.

During a May 4, 1993 physiatric[6] consultation with Dr.

Thomas, Lord complained of lower-back pain radiating down into

the buttocks and left thigh with intermittent numbness in his

left toes.  Although Lord described a "full-blown, classic,

chronic pain lifestyle," he was taking no medications.  Physical

examination revealed limited trunk rotation, lateral bending, and

extension.  Lord was able to balance without difficulty, and his

gait was unremarkable.  Dr. Thomas diagnosed two-level disc

disease without radiculopathy.[7]  Dr. Thomas discussed with Lord

the possibility of settling his Worker's Compensation case and

using the proceeds to fund membership in a health center where he

could engage in an independent exercise program.  Subsequent

testing revealed a twenty-two percent impairment of the whole

person.

On March 21, 1994, Lord was examined by Dr. Vincent

---

[6]  The specialization in physical or rehabilitation medicine.

[7]  Radiculopathy means "disease of the nerve roots." Dorland's Illustrated Medical Dictionary 1404 (28th ed. 1994).

Giustolisi.  Lord complained of pain in his lower back that radiated into both buttocks and legs.  He stated that the pain increased with activity and varied with the weather.  He further stated that he was taking no medication for the pain.  Dr. Giustolisi noted that although Lord appeared uncomfortable during the examination, he "ambulate[d] into the office without any difficulty" and dismounted the examination table "without any undue discomfort."  Examination of Lord's back revealed decreased forward flexion and lateral bending with normal extension and rotation of the trunk.  Lord was able to heel-and-toe walk without difficulty.  Dr. Giustolisi concluded that Lord could perform light-duty work that did not involve prolonged standing, stooping, squatting, or lifting more than 25 pounds.  He rated Lord as having a thirteen percent impairment of the whole body.

On April 11, 1994, Lord's attorney referred him to Dr. Andrew Rudins for examination.  Lord described an "ache" in his lower back and a "slight ache" in the left buttock that would occasionally become a deep pain following physical therapy.  Dr.

Rudins noted that Lord experienced shortness of breath on exertion, which Lord attributed to "heavy cigarette smoking." Lord indicated that with the exception of weekly trips to the grocery store and the bank, he generally stayed at home and watched television. Although he stated that he could not mow the lawn or shovel snow, Lord stated that he would do light housekeeping chores such as cleaning up and washing dishes.

On physical examination, Dr. Rudins noted Lord to be sitting "comfortably in no obvious distress." His gait, including heel-and-toe walking, was normal. Forward flexion of the trunk was limited, while extension was not. Rotation and lateral extension of the trunk were nearly full with no obvious discomfort. Dr. Rudins found that Lord's prior whole person impairment rating of twenty-two percent was reasonable. Additionally, Dr. Rudins determined that Lord could perform work "at a light duty capacity" and recommended that Lord participate in a home exercise program, gradually increasing his physical activity level. Noting that Lord's pain would likely persist for

the foreseeable future, Dr. Rudins recommended that Lord enter a pain-management program.

In a June 29, 1994 notation, Dr. Rudins noted that Lord was limited to "sedentary activities only due to pain." He noted that Lord would require frequent rest breaks and again recommended enrollment in a pain-management program.

Lord does not appear to have sought any medical care during the period from July 1994 through September 1995. On October 25, 1995, he went to the Lahey-Hitchcock Clinic in Keene, where he told Mary Berube, M.S., ARNP, that he suffered from chronic low back pain. Lord reported that he did not take any particular medication for his back, although he sometimes used aspirin and occasionally took Tylenol. See Tr. at 335. (Lord has stated on other occasions that he is wary about taking medications because he is a recovering alcoholic. See id. at 52.) Lord also reported that he felt "very depressed." Nurse Practitioner

Berube started Lord on Trazadone[8] at a dosage of 150 mgs.

Nurse Practitioner Berube saw Lord once again on November 27, 1995, when she noted that Lord displayed some limitation of back motion.[9]  Straight-leg raising was limited to 60 degrees in both legs due to back pain.  Palpitation of Lord's lower lumbar spine produced mild tenderness and no spasm, see Tr. at 335, and his reflexes and motor strength were normal.  Lord reported that he felt more depressed during "this time of the year," but stated that Trazadone was helping this condition.

## 2.    Medical Evidence After December 31, 1995

Lord's insured status for disability ended on December 31, 1995.  He next sought medical care in June 1996.  At that time, he told Nurse Practitioner Berube that his back had been doing better since his last visit, that he was sleeping better and

---

[8]  Trazadone hydrochloride is "an antidepressant used to treat major depressive episodes with or without prominent anxiety."  Dorland's Illustrated Medical Dictionary 1736 (28th ed. 1994).

[9]  Lord saw Dr. Makman at the Hitchcock Clinic in November 1995, but the record does not contain this physician's report.

feeling less depressed, and that he was "able to do more" and was taking walks three days a week. Lord said that he felt ready to try a more rigorous exercise program. His cholesterol level was somewhat elevated, and necessary dietary changes were discussed "at great length." He continued on Trazadone at a dosage of 150 mgs.

In November 1996, Lord was examined by orthopedist Dr. Matthew Donovan for a Medicaid disability evaluation. Lord told Dr. Donovan that he had persistent pain in his lower back and left leg, which was exacerbated more by standing than by sitting. Dr. Donovan assessed (1) radiculitis,[10] and (2) MRI disc herniation. On examination, Lord was unable to touch the floor with his fingers, but was able to walk on his heels and toes. Neurological findings were normal; Lord showed good muscle strength and showed no sign of reflex or sensory deficits. Dr.

---

[10] Radiculitis refers to "inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal." Dorland's Illustrated Medical Dictionary 1404 (28th ed. 1994).

Donovan felt that a prior MRI showed some nerve root compression at L5-S1.  The doctor also opined that Lord's potential for returning to work was poor to fair because Lord had been unable to return to gainful employment for six years.  He felt that this was partly due to Lord's "chronic deconditioning to the work place."  Dr. Donovan mentioned that Lord had already been to vocational rehabilitation, which had not provided him with any benefit.

Lord continued to seek treatment from Lahey-Hitchcock Clinic during 1997 and 1998.  On May 28, 1997, Nurse Practitioner Berube assessed (1) anxiety/depression; (2) chronic back pain; and (3) degenerative joint disease.  Lord was planning at that time to start a pain management program at Antioch.  He felt that the Trazadone was helpful and his nurse practitioner increased his dosage to 250 mg.  Regular office visits to the clinic through 1997 and 1998 show continued treatment for back pain and depression/anxiety.

On December 10, 1997, Lord went to Monadnock Family Services

(MFS) for a mental status examination. His chief complaint was depression and thoughts of suicide. He reported having a sleep disturbance since 1995. Robert Duncan, M.D. and Nancy Righter, CSW diagnosed (1) chronic pain; (2) dysthymia;[11] (3) Major Depressive Episode, moderate without psychosis; and (4) polysubstance abuse, in remission. They rated his Global Assessment of Functioning (GAF) at Axis V as 50.[12] Dr. Duncan and Ms. Righter noted that during the previous five years, Lord had experienced worsened mood, greater helplessness, and lower self-worth.

Lord continued treatment for depression at MFS during January and February 1998. His treatment goals were to manage

---

[11] Dysthymia is "a mood disorder characterized by depressed feeling . . . and loss of interest or pleasure in one's usual activities and in which the associated symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depression." Dorland's Illustrated Medical Dictionary 519 (28th ed. 1994)

[12] A score of 50 on the GAF scale indicates serious symptoms or a serious impairment in social, occupational, or school functioning. See Diagnosotic and Statistical Manual of Mental Disorders: DSM-IV 32 (4th ed. 1994).

more effectively his symptoms of depression and his back pain, and to combat his feelings of isolation.

### a. Dr. Smolen's November 1998 Letter

On November 28, 1998, Dr. Smolen, who was Lord's treating physician from August 16, 1990 to April 8, 1993, wrote a letter at the request of Lord's attorney that summarized his opinion of Lord's condition during that period. According to Dr. Smolen's letter, Lord suffered from acute low back strain with left-sided herniated discs at L4 and L5-S1. Dr. Smolen wrote that Lord's condition progressed into chronic debilitating pain that made it impossible for him to recover any functional capacity to work.

Dr. Smolen stated that Lord underwent a full course of comprehensive, state-of-the-art low back computerized testing and rehabilitation. Spinal testing results revealed that Lord's back fatigued quickly and considerably during a muscular effort of only 50% of his measured lifting capacity. Computerized testing revealed that even after strenuous exercise designed to increase back strength by 50%, Lord's back strength was "still dangerously

low." Tr. at 294. Dr. Smolen opined that Lord was fully cooperative and compliant with all treatment plans.

Dr. Smolen wrote that during each of his examinations, he found Lord to be suffering from low back and leg pain with some degree of weakness and numbness in the leg. The doctor noted that Lord had consistent difficulty with standing, sitting, bending, twisting, and turning. Dr. Smolen felt that Lord had to remain sedentary at home.

Based on a review of his own records and the reports of other (unspecified) consulting and treating physicians, Dr. Smolen concluded that Lord: (1) could sit 6 out of 8 hours with breaks as needed to change position; (2) should avoid essentially all lifting; (3) could (but really should not) carry 10 pounds occasionally; (4) could use his arms and hands repetitively for fine manipulation and grasping (but if this activity was done in a sitting position, the total sitting time would have to be diminished by 50%); (5) should not do any pushing or pulling or repetitive operation of foot controls; (6) should never bend,

squat, crawl, stoop, crouch, or kneel; (7) should avoid exposure to unprotected heights or moving machinery; (8) should avoid driving for more than 30-60 minutes at a time and should drive only on smooth pavement; and (9) should avoid any activities that increase his degree of pain.

Finally, Dr. Smolen opined in his November 1998 letter that Lord was completely disabled from performing any kind of work from August 1990 to April 1993, the period that Lord was under the doctor's treatment.

### b. Rehabilitation Counselor Durant's December 1998 Letter

On December 4, 1998, Beth Durant, a rehabilitation counselor with the state of New Hampshire's Vocational Rehabilitation program, wrote a letter about Lord at the request of his attorney. Durant reported that she began working with Lord in June 1996. She stated that he was interested in pursuing a vocation despite his "disabilities." Tr. at 303. Durant opined that Lord demonstrated a good faith effort by obtaining a GED and attending career-related workshops. She also wrote that Lord was

-21-

never able to participate fully in Vocational Rehabilitation services because of severe back and leg pain. She opined that Lord's "disabilities create significant barriers to employment." Id. at 303. She added that in her opinion Lord would not overcome those barriers. Durant stated that Lord's physical "disabilities" had worsened and that his medical problems caused a lot of fatigue and a decreased ability to concentrate. She stated that it would be extremely difficult for Lord to learn new tasks and that he could not return to his previous work. She noted that she planned to close Lord's file in the near future because they had not actively worked together since mid-1997 due to Lord's physical limitations.

3.   **Testimony Offered at November 19, 1998 Administrative Hearing**

a.   **Lord's Testimony**

At the administrative hearing held before ALJ Ruth Kleinfeld on November 19, 1998, Lord testified that he was unable to work due to severe pain and depression. He stated that physical therapy made his back weaker rather than stronger. He also

testified that he could not squat or bend over, and that if he kneels, he needs help to get back up.  Lord testified that he used a cane prescribed in therapy, and that he used a walking stick that had not been prescribed by a doctor to help him to get around.

Lord testified at the hearing that he did not have a primary care physician after Dr. Smolen retired in 1993.  He expressed dissatisfaction with other treatment sources available to him. He reported that he first obtained Medicaid coverage under the Aid for the Permanently and Totally Disabled (APTD) program in 1995 and that he did not have medical insurance prior to that time.

Lord testified that his depression was not under control and that he had suicidal thoughts.  He claimed that he had problems with depression since 1992 or 1993.  He stated that half an hour after watching television news, he was unable to remember the content of the program.  See Tr. at 246.

In his testimony, Lord described a daily routine in which he

frequently needed to lie down.  He stated that he got up between 7:00 and 8:00 a.m., and that between that time and noon, he spent two hours lying down.  He testified that in the middle of the day he spent more time lying down.  He stated that he got up at approximately 3:00 p.m., and could usually sit for an hour or so before he needed to lie down again.  See id.

### b.  Vocational Expert Testimony

Vocational Expert (VE) Christine Spaulding also testified at the November 1998 hearing.  The ALJ asked the VE to consider a person with Lord's vocational profile who could perform light and sedentary work but who was (1) required to avoid stooping; (2) required to avoid exposure to unprotected heights or vibration; and (3) able to perform only simple unskilled tasks due to limitations in concentration.  See Tr. at 249-50.  In response to this hypothetical, the VE testified that such a person should be able to perform the occupations of sedentary cashier (51,000 jobs nationally), light cashier (400,000 jobs nationally), light general clerk (35,000 jobs nationally), sedentary surveillance

monitor (10,000 jobs nationally), sedentary security guard (50,000 jobs nationally), light security guard (200,000 jobs nationally), sedentary inspector and checker (7,000 jobs nationally), and light inspector and checker (55,000 jobs nationally). In response to a hypothetical posed by Lord's attorney, which added to the limitations identified by the ALJ the need to lie down at least three times during the work day for periods of at least 15 minutes each, the VE testified that such a person would not be able to perform any of the jobs she had listed.

## II. Standard of Review

After a final determination by the Commissioner denying a claimant's application for benefits, and upon a timely request by the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the ALJ's decision. See 42 U.S.C. § 405(g). My review is limited in scope, however, as the ALJ's factual findings are

conclusive if they are supported by substantial evidence.  See Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); 42 U.S.C. § 405(g).  The ALJ is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence.  See Irlanda Ortiz, 955 F.2d at 769.  Therefore, I must "'uphold the [ALJ's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion.'"  Id. (quoting Rodriguez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

While the ALJ's findings of fact are conclusive when supported by substantial evidence, they "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).  I apply these standards in reviewing Lord's case on appeal.

## III. Analysis

Lord makes three closely related arguments in this appeal. First, he contends that ALJ Kleinfeld erred by failing to address in her written decision relevant medical and vocational evidence that he submitted after the November 1998 hearing (the "post-hearing evidence"). See Mem. in Supp. of Pl.'s Mot. For Order to Reverse (Doc. #7) at 3-9. Second, he claims that the ALJ's determination of his residual functional capacity (RFC) was erroneous, largely because it was inconsistent with the post-hearing evidence of his physical and mental impairments. See id. at 10-12.[13] Finally, Lord argues that the ALJ's hypothetical question to the VE failed to convey the extent of his physical limitations because the question did not take into account a

---

[13] Lord also argues that the ALJ's RFC determination was erroneous because the ALJ "did not consider [his] non-exertional limitations, particularly his inability to stoop, within the framework of Social Security Ruling (SSR) 96-9p." Mem. in Supp. of Pl.'s Mot. for an Order to Reverse (Doc. #7) at 1-2; see also id. at 11. Because I conclude that this case must be remanded on other grounds, I express no opinion as to whether that ruling applies to Lord's claim or, if so, whether it is in conflict with the ALJ's RFC determination.

critical piece of post-hearing evidence, the November 1998 letter written by Dr. Smolen. See id. at 12-14.

Although Lord raises three main arguments in his brief, his appeal turns in large part upon a single issue: whether the ALJ committed legal error by failing to discuss the post-hearing evidence in her written decision. Because I answer this question in the affirmative, for the reasons set forth below, I need not address Lord's other arguments.[14]

A.      **The ALJ's Failure to Discuss the Post-Hearing Evidence**

This is not a case of evidence being submitted for the first time while the claimant's case is before the Appeals Council or a reviewing court. All of the post-hearing evidence was part of the record before the ALJ when she issued her decision on May 27, 1999. See Tr. at 252-53 (noting that the record was reopened on

---

[14]   Whether it will be necessary on remand to make a new determination of Lord's RFC and/or seek additional vocational testimony will depend upon the Commissioner's evaluation of the entire record, including the post-hearing evidence.

May 15, 1999 to receive the post-hearing evidence).[15]  The SSA's

regulations and directives allow for a claimant to submit

additional evidence after an administrative hearing but before

the ALJ renders her decision.  See 20 C.F.R. §§ 404.936(a),

404.944 (1999); HALLEX I-2-630, 1993 WL 643026 (June 30, 1994);

HALLEX I-2-678, 1993 WL 751904 (June 30, 1994).  Because the

post-hearing evidence was made part of the record before the ALJ

issued her decision, the fact that the evidence was submitted

after the hearing is irrelevant.  Therefore, the question

presented by this case is whether the validity of the ALJ's

decision is undermined by her failure to discuss explicitly this

---

[15]  At the November 10, 1998 hearing, the ALJ agreed to leave the record open for 30 days to receive additional evidence in support of Lord's claim.  See Tr. at 231.  Some of the post-hearing evidence is stamped as having been received on December 10, 1998, see id. at 303 (Durant letter), 327 (MFS records), some was submitted more than 30 days after the hearing, see id. at 334, 357 (Berube notes from Lahey-Hitchcock Clinic, stamped received January 11, 1999), and the remainder was received at a date that cannot be clearly ascertained from the record.  It is clear, however, that all of the post-hearing evidence was docketed as part of the record on May 15, 1999, twelve days before the ALJ issued her decision.  See id. at 212, 252-53.

substantial body of evidence.

Examination of relevant precedent on this issue yields two basic principles. First, the First Circuit has held that an ALJ's written decision need not directly address every piece of evidence in the administrative record. See Shaw v. Secretary of Health and Human Servs., 25 F.3d 1037, 1994 WL 251000, at *5 (1st Cir. June 9, 1994) (per curiam; table, text available on Westlaw) ("We agree with the district court that while the ALJ did not expressly cite the agency doctor's reports (only the agency findings) he implicitly took them into account. While we would prefer more explanatory detail, and the new regulation contemplates greater detail, we see no reason to return this case for the purely formulaic purpose of having the ALJ write out what seems plain on a review of the record."); Rodriquez v. Secretary of Health and Human Servs., 915 F.2d 1557, 1990 WL 152336, at *1 (1st Cir. Sept. 11, 1990) (per curiam; table, text available on Westlaw) ("An ALJ is not required to expressly refer to each document in the record, piece-by-piece."); Goodermote v.

Secretary of Health and Human Servs., 690 F.2d 5, 8 (1st Cir.
1982) (finding no merit in claim that ALJ did not specifically
discuss doctor's report, because ALJ quoted from other evidence
that accurately summarized the contents of that report); cf. NLRB
v. Beverly Enterprises-Massachusetts, Inc., 174 F.3d 13, 26 (1st
Cir. 1999) (noting in labor relations context that "[a]n ALJ can
consider all the evidence without directly addressing in his
written decision every piece of evidence submitted by a party").
Courts have held that an ALJ's failure to address a specific
piece or pieces of evidence did not undermine the validity of her
conclusion, for example, when that conclusion was supported by
citations to substantial medical evidence in the record and the
unaddressed evidence was either cumulative of the evidence
discussed by the ALJ or otherwise failed to support the
claimant's position.  See Rodriguez, 915 F.2d 1557, 1990 WL
152336, at *1-4; Goodermote, 690 F.2d at 8; Ortiz v. Apfel, 55 F.
Supp.2d 96, 103 & n.1 (D.P.R. 1999) (concluding that therapy
notes made by psychiatrist, which were not discussed by the ALJ,

-31-

did not appreciably support claimant's claim).

At the same time, the First Circuit and district courts within the circuit have held that an ALJ may not simply ignore relevant evidence, especially when that evidence supports a claimant's cause. See Nguyen, 172 F.2d at 35 (citing cases); Suarez v. Secretary of Health and Human Servs., 740 F.2d 1, 1 (1st Cir. 1984) (per curiam); Dedis v. Chater, 956 F. Supp. 45, 51 (D. Mass. 1997) ("While the ALJ is free to make a finding which gives less credence to certain evidence, he cannot simply ignore . . . the 'body of evidence opposed to . . . [his] view.'") (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Diaz v. Secretary of Health and Human Servs., 791 F. Supp. 905, 912 (D.P.R. 1992) (same). For a reviewing court to be satisfied that an ALJ's decision was supported by substantial evidence, that decision "'must take into account whatever in the record fairly detracts from its weight.'" Diaz, 791 F. Supp. at 912 (quoting Universal Camera, 340 U.S. at 488).

To determine whether a claimant is disabled, an ALJ must

consider and evaluate all evidence, whether objective or subjective, that is relevant to the claim. See Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981), reh'g denied, 650 F.2d 481 (3d Cir. 1981); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980). The SSA's regulations define "evidence" as "anything [the claimant] or anyone else submits to [SSA] or that [SSA] obtain[s] that relates to [the] claim." 20 C.F.R. § 404.1512(b) (1999). Relevant evidence may include, but is not limited to, the following types of information: objective medical evidence; other evidence from medical sources; statements about the claimant's impairment(s) made by the claimant or others, including testimony offered at administrative hearings; and information from other sources, such as public and private social welfare agencies, non-medical sources, and other practitioners. See id.; 20 C.F.R. §§ 404.1513(e) (1999). If any of the evidence in a case record is inconsistent, the ALJ must weigh the conflicting evidence and decide which evidence to credit. See 20 C.F.R. § 404.1527(c)(2) (1999).

In the present case, because the ALJ's decision completely failed to mention any of the post-hearing evidence, it is impossible to determine whether this evidence was considered and implicitly discredited or instead was simply overlooked. See Cotter, 642 F.2d at 705 ("[W]e need from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected. In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."). The post-hearing evidence at issue consists of five items: (1) the November 1998 letter written by Dr. Smolen, Lord's treating physician, see Tr. at 293-96; (2) the office notes written by Dr. Donovan, the orthopedist who examined Lord in November 1996, see id. at 297-302; (3) the letter written by Rehabilitation Counselor Beth Durant on December 4, 1998, see id. at 303; (4) the records of Lord's treatment at Monadnock Family Services between December 10, 1997 and February 25, 1998, see id. at 304-33; and (5) Nurse

Practitioner Berube's notes documenting her treatment of Lord at the Lahey-Hitchcock Clinic between October 25, 1995 and December 16, 1998, see id. at 335-57.[16]

At least some of this evidence is relevant to (and arguably supports) Lord's claim. Both parties focus their arguments most pointedly on the letter written by Dr. Smolen in November 1998. See Mem. in Supp. of Pl.'s Mot. For Order to Reverse (Doc. #7) at 4, 5-7, 10-11, 12-14; Mem. in Supp. of Def.'s Mot. for Order Affirming the Decision of the Commissioner (Doc. #10) at 2, 3, 7-10. In that document, Dr. Smolen both (1) opines that Lord "was completely disabled from any kind of work" from August 1990 to April 1993, the period during which he treated Lord, and (2) provides a detailed retrospective evaluation of Lord's functional

---

[16] Lord submitted three letters from Dr. Robert E. Smith of the Lahey-Hitchcock Clinic at the November 10, 1998 hearing. See Tr. at 290-92. These records demonstrate that Lord was diagnosed with Hepatitis C in August-September 1998. The ALJ expressly discussed this evidence in her decision, concluding that there was no medical evidence to suggest that this condition had reached a severe level prior to December 31, 1995, the date that Lord's insured status expired. See id. at 202. Lord does not challenge this conclusion on appeal.

limitations.  See Tr. at 294-95.  Both of these opinions should have received the ALJ's consideration.

Regarding Dr. Smolen's opinion that Lord was completely disabled during the period of treatment, it is true that the ultimate disability determination is reserved to the Commissioner and that a treating physician's opinion on the issue of disability is therefore not entitled to controlling weight or special significance.  See 20 C.F.R. § 1527(e)(1) (1999); SSR 96-5p, 1996 WL 374183, at *2, 5 (1996); Arroyo v. Secretary of Health and Human Servs., 932 F.2d 82, 89 (1st Cir. 1991) (per curiam).  At the same time, the SSA has instructed ALJs that a doctor's opinion as to whether a claimant is disabled "must not be disregarded."  SSR 96-5p, 1996 WL 374183, at *5.  In the present case, the ALJ's complete failure to address Dr. Smolen's November 1998 letter at least raises the possibility that she disregarded the opinion as to Lord's disability that is contained in that letter.

Dr. Smolen's November 1998 evaluation of Lord's functional

limitations was also relevant evidence that should have received careful consideration from the ALJ.  This is especially true because the functional evaluation contained in Dr. Smolen's November 1998 letter was both more detailed and more restrictive than the RFC determination made by the ALJ and the hypothetical question that the ALJ posed to the VE at the administrative hearing.  Compare Tr. at 294-95 (Dr. Smolen's November 1998 evaluation), with id. at 205, 208, 210 (ALJ's RFC determination) and id. at 249-50 (hypothetical to VE).  Unlike Dr. Smolen's April 1993 opinion and other medical opinions in the record, Dr. Smolen's November 1998 letter provided a comprehensive evaluation of Lord's functional limitations based upon a review of Dr. Smolen's records and the records of other physicians involved in Lord's treatment.  See id. at 294.[17]  Moreover, Dr. Smolen was

---

[17]  Because Dr. Smolen's November 1998 functional assessment was so restrictive, and because it was based on medical records generated during the insured period, it was relevant evidence that should have been considered by the ALJ.  Cf. Marcotte v. Callahan, 992 F. Supp. 485, 491 (D.N.H. 1997) ("Retrospective diagnoses (medical opinions of claimant's impairments which relate back to the covered period) may be considered only to the

Lord's primary treating physician during a substantial portion of

the relevant period.  While the opinion of a treating physician

is not entitled to "controlling weight" when it is "inconsistent

with the other substantial evidence in the case record," such an

opinion is "still entitled to deference and must be weighed" in

accordance with various factors set forth in the SSA's

regulations.  SSR 96-2p, 1996 WL 374188, at *4 (1996); see also

20 C.F.R. § 404.1527(d)(2) (1999).

Because the ALJ did not address Dr. Smolen's November 1998

evaluation of Lord's functional limitations in her decision, I

cannot determine whether she properly weighed that evidence in

light of the applicable factors listed in the SSA regulations.

Moreover, this omission directly conflicts with the SSA's

regulations, which provide that "[w]e will always give good

---

extent that such opinions both substantiate a disability that
existed during the eligible period and are corroborated by
evidence contemporaneous with the eligible period.").  In
addition, the fact that the November 1998 letter was prepared for
purposes of this litigation does not in itself detract from its
evidentiary value.  See Gonzalez Perez v. Secretary of Health and
Human Servs., 812 F.2d 747, 749 (1st Cir. 1987) (per curiam).

reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 1527(d)(2). Accordingly, while the ALJ was entitled to find Dr. Smolen's November 1998 letter unworthy of credit, she was not entitled to find it unworthy of comment.

Finally, I am not persuaded by the Commissioner's suggestion that the opinions expressed in Dr. Smolen's November 1998 letter were "merely cumulative" of the doctor's 1993 opinion, Mem. in Supp. of Def.'s Mot. for Order Affirming the Decision of the Commissioner (Doc. #10) at 7, which the ALJ explicitly discussed and rejected in her decision. See Tr. at 206. As previously noted, Dr. Smolen's November 1998 evaluation of Lord's functional limitations was more detailed, more restrictive, and based on a wider range of medical records than his April 1993 opinion.[18]

_____

[18] The Commissioner acknowledges elsewhere in his brief that Dr. Smolen's November 1998 letter presented a picture of Lord's limitations during the relevant period that differed from that presented in his April 1993 opinion. See Mem. in Supp. of Def.'s Mot. for Order Affirming the Decision of the Commissioner (Doc. #10) at 4.

Furthermore, one the ALJ's chief reasons for discounting Dr. Smolen's earlier opinion -- the possibility that it was colored by Lord's pending worker's compensation case, see Tr. at 206 -- does not apply to Dr. Smolen's November 1998 opinion, which was apparently rendered long after Lord's worker's compensation case was settled. See Mem. in Supp. of Pl.'s Mot. for Order to Reverse (Doc. #7) at 6-7.[19]

Accordingly, I conclude that the ALJ committed legal error by failing to address Dr. Smolen's November 1998 letter in her decision. Because I determine that this omission is in itself sufficient basis for remand, I need not engage in extensive analysis of the other four items of post-hearing evidence. I

---

[19] I also find the Commissioner's law of the case argument unpersuasive. My responsibility when performing judicial review of final decisions by the Commissioner is to determine whether the decision could be accepted by a reasonable person reviewing the evidence in the record as a whole. See Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam). Accordingly, in this case I must determine whether ALJ Kleinfeld's decision is supported by substantial evidence in the record that was before her; I cannot rely upon an opinion I previously issued when reviewing ALJ Harap's decision, which was based on a different evidentiary record.

note, however, that at least some of this evidence may also be relevant to Lord's limitations during the insured period and therefore worthy of consideration on remand.  For example, Lord began receiving treatment from Nurse Practitioner Mary Berube at the Lahey-Hitchcock Clinic in October 1995, see Tr. at 335, several months before the expiration of his insured status.  Moreover, the ALJ should be mindful when reviewing the records produced by Dr. Donovan and Monadnock Family Services that

"[m]edical evidence generated after a claimant's insured status expires may be considered for what light (if any) it sheds on the question of whether claimant's impairment(s) reached disabling severity before claimant's insured status expired."  Moret Rivera v. Secretary of Health and Human Servs., 19 F.3d 1427, 1994 WL 107870, at *5 (1st Cir. Mar. 23, 1994) (per curiam; table, text available on Westlaw).

## IV.  Conclusion

It is with reluctance and a keen awareness of the importance of finality for both parties that I remand Lord's claim for the

-41-

second time.  I cannot ignore, however, the possibility that post-hearing evidence submitted by Lord with the ALJ's express assent did not receive due consideration.  Accordingly, I grant Lord's motion for an order reversing the Commissioner's decision (Doc. #7) and remand this case for further proceedings in accordance with this memorandum and order.  It is possible that on remand, the Commissioner will once again conclude that during the insured period, Lord was not disabled within the meaning of the Social Security Act.  If he reaches such a conclusion, however, he must do so in a manner that demonstrates that all the relevant evidence in the record was considered in accordance with applicable legal standards.  Because this remand is made pursuant to sentence four of 42 U.S.C. § 405(g), the Clerk is instructed to enter judgment forthwith in accordance with this order.  See Shalala v. Schaefer, 509 U.S. 292 (1993).

        SO ORDERED.


                                    _____

                                        Paul Barbadoro
                                        Chief Judge


July 27, 2000

cc:   Jonathan P. Baird, Esq.
      David L. Broderick, Esq.