**Spinale v. SSA**                    **CV-03-069-B    01/05/04**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Karen A. Spinale</u>

    v.                                    Civil No. 03-069-B
                                       Opinion No. 2004 DNH 007
<u>Jo Anne B. Barnhart,</u>
<u>Commissioner, Social</u>
<u>Security Administration</u>

<u>MEMORANDUM AND ORDER</u>

Karen Spinale applied for Social Security Disability Insurance Benefits ("DIB") on February 5, 2001 (Tr. 74). Her application was denied and she then requested a hearing before an administrative law judge ("ALJ"). After presiding over the hearing at which Spinale, represented by an attorney, Spinale's mother, and a vocational expert testified, the ALJ determined that Spinale was not entitled to DIB because her residual functional capacity ("RFC") for light work did not prevent her from performing her past relevant work as a maid. (Tr. 9-18.) The Appeals Council then denied Spinale's request for review on December 30, 2002 (Tr.4-6).

Spinale seeks judicial review of the Social Security Commissioner's ("Commissioner") decision denying her 2001

application.  Spinale argues that the ALJ erred at the fourth step in the Social Security Administration ("SSA") evaluation process by determining that her RFC allowed her to return to her prior work as a maid.  In particular, Spinale complains that the ALJ committed an error of law by failing to consider the medical opinion of a treating source that Spinale suffered from a psychological condition giving her a moderate degree of functional loss in relation to her daily activities, social interactions, work related situations, and caused her to be unable to do any substantial gainful work (Tr. 183).  Spinale also complains that the ALJ's determination that she is capable of returning to her past relevant work as a maid is not supported by substantial evidence on the record.  For these reasons Spinale moves to remand.  The Commissioner, in turn, moves to affirm.

## I.  BACKGROUND[1]

### A.  Education and Work History

Spinale was born June 21, 1968, and is a high school graduate who completed a certified nurse's assistant ("CNA") course in 1990 (Tr. 90).  Her past relevant work experience has

---

[1]  All background facts come from the parties Joint Statement of Material Facts.

been as a waitress, a certified nurse's assistant, a housekeeper, and a homemaker (Tr. 85, 93-100, 110). As a housekeeper, she never had to lift more than ten pounds (Tr. 95). According to her medical records, Spinale has also worked at a Mini-Mart in Hampton Falls in April 1999 (Tr. 112, 114).

## B. <u>Medical History (Physical)</u>

Spinale was hospitalized at Exeter Hospital for severe asthma following a lower respiratory viral infection in April 1999 (Tr. 112-21). After treatment, she showed gradual improvement and was discharged after two days (Tr. 115). Although suffering from severe, but controlled asthma, Spinale had not been hospitalized for asthma at all for the three years prior to 1999 (Tr. 139-50).[2] In May 2000, Spinale returned to Exeter Hospital complaining of chest wall and upper back pain radiating to the neck and left arm for which she was prescribed Prednisone, an anti-inflammatory medication (Tr. 122-33). On

---

[2] On February 1, 2001, she was admitted again to Exeter Hospital by Dr. Andrew Weeks in marked respiratory distress after the onset of sinus symptoms, rhinorrhea, congestion, and an increasing shortness of breath with mild pleuritic chest pain (Tr. 139).

June 13, 2000, she was referred to the Exeter Hospital pain clinic for evaluation and treatment of lower back pain and right sciatica[3] (Tr. 134-36). Spinale reported having undergone discectomies at L4-5 and L5-S1 six years earlier and had since experienced intermittent episodes of right sciatica lasting a few days at a time (Tr. 134). She had been treated a month earlier for the same symptoms with a prescription for a non-steroid anti-inflammatory, Vioxx (Id.). Spinale reported that the Vioxx had alleviated her pain "significantly," and it was suggested she continue taking Vioxx for a couple more weeks and to then re-evaluate her pain (Id.). In September, she began a series of eight physical therapy sessions for chronic cervical strain (Tr. 190). It was noted that Spinale could perform all activities but with chronic pain (Tr. 191). This condition was reportedly related to a motor vehicle accident earlier that same year (Tr. 192). A cervical x-ray showed a slight movement of C2 anteriorly to C3 with flexion, but no movement of the vertebral bodies upon

_____

[3] Sciatica is pain in the lower back and hip radiating down the back of the thigh into the leg, usually due to herniated lumbar disks. Stedman's Medical Dictionary [hereinafter Stedman's], 1602 (27th ed. 2000).

-4-

each other with extension, and the paravertebral soft tissue spaces appeared normal (Tr. 197). An MRI in October 2001 showed a slight bulge of the C6 disc of questionable significance but no evidence of narrowing of the space underneath the arachnoid membrane (the middle of the three coverings of the central nervous system) or narrowing of the neural foramen, and no cord atrophy or swelling (Tr. 203).

In June 2001, Spinale had a ganglion[4] removed from the dorsal aspect of her left wrist (Tr. 151-57).

C.    **Medical History (Mental)**

Barbara Gaffney, a licensed social worker, prepared an intake evaluation of Spinale for Seacoast Mental Health Center, Inc ("SMHC") in June 2000 (Tr. 158-62). Spinale complained of depression, a lack of sleep, indicated that she had been taking Prozac[5] for years, and was having a "harder time" since January when her daughter disclosed sexual abuse at the hands of her

_____

[4] A ganglion is a cyst containing mucopolysaccharide-rich fluid within the fibrous tissue or, occasionally, muscle bone or a similar cartilage; usually attached to a tendon sheath in the hand, wrist, or foot. Stedman's, supra at 726.

[5] Prozac is for treating depression. Physicians' Desk Reference [hereinafter PDR] 1232 (57th ed. 2003)

father (Tr. 158).  Ms. Gaffney concluded that Spinale did not meet the criteria for state supported services at that time because it appeared that many of her functional difficulties stemmed from her reaction to her daughter's sexual abuse (Tr. 161).

Spinale was referred to psychiatry (Tr. 182) and was examined by Amy Feitelson, M.D., a staff psychiatrist at SMHC, on July 31, 2000 (Tr. 163-65).  Spinale was cooperative throughout the evaluation and showed no signs of psychomotor retardation or agitation, but her mood was depressed and her affect constricted (Tr. 164).  Dr. Feitelson diagnosed a mood disorder not otherwise specified ("NOS"), rule out bipolar, type II, post-traumatic stress disorder ("PTSD"), major depression, and rated Spinale's global assessment of functioning ("GAF") at 60 (Id.)[6].

Spinale continued to see Dr. Feitelson about once a month since September 2000 to monitor and adjust her medication (Tr. 166-72, 175, 178-81).  In September, Dr. Feitelson began tapering

---

[6] A GAF rating between 51 and 60 is indicative of an individual who has moderate psychological symptoms or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed., text rev. 2000).

down Spinale's Prozac dosage, increased her Topamax dosage, stopped her Xanax prescription, and began her on BuSpar.[7] In October, Dr. Feitelson took Spinale completely off Prozac and BuSpar, started her on Risperdal and Wellbutrin, and cut back her dosage of Topamax.[8] In November, Spinale also began taking Klonopin at night to help her sleep.[9] By January 2001, Dr. Feitelson added Lithium Carbonate to Spinale's medication regime and took her off Risperdal.[10] In April, Spinale had stopped taking Topamax, but was placed back on it to help ease her agitation. Dr. Feitelson then added Neurontin to Spinale's prescription in September.[11] In November, Seroquel was added to

---

[7] Topamax is for treating seizures while Xanax and BuSpar (buspirone HCL) are for anxiety disorders. PDR, supra at 2501, 2794, 2517 (57th ed. 2003).

[8] Risperdal is for treating schizophrenia and Wellbutrin treats depression. PDR, supra at 1786, 1682.

[9] Klonopin is for the treatment of panic disorders. PDR, supra at 2905.

[10] Lithium Carbonate is used in the treatment of depressive, hypomanic, and manic phases of bipolar affective disorders. Stedman's at 1024.

[11] Neurontin is used in the treatment of partial seizures. PDR, supra at 2563.

the Lithium, Wellbutrin, Topamax, and Klonopin.[12]  According to Dr. Feitelson, as of January 2002, Spinale was taking Wellbutrin, Topamax, Neurontin, and Klonopin (Tr. 183).

Dr. Feitelson noted that throughout the year and a half she treated Spinale, Spinale's mood, depression, agitation, and ability to focus vacillated, not dramatically improving nor declining.  In a letter to Spinale's attorney dated January 11, 2002, Dr. Feitelson recounted how she had recommended Spinale see a therapist but that Spinale had difficulty doing so on a routine basis.  She stated that she had diagnosed Spinale with a Mood Disorder, NOS, ruled out Bipolar, Type II, PTSD, major depression, and determined that Spinale currently had trouble with mood control and irritability.  She also opined that Spinale suffered from a psychological condition that caused her "to be unable to do any substantial gainful work, which psychological condition has lasted 12 months and will be expected to last twelve months in a row."  (Tr. 183.)

Dr. Feitelson also completed a psychiatric evaluation form for Spinale on January 28, 2002.  She concluded that Spinale had

---

[12] Seroquel is used in the treatment of schizophrenia.  PDR, supra at 681.

-8-

a depressed and anxious mood, but had a full range of affect (Tr. 247). She went on to report that Spinale had a moderate limitation in daily living activities and moderate difficulty with performing tasks because she was forgetful and unorganized (Tr. 248). Dr. Feitelson opined that Spinale had repeated episodes of deterioration or decompensation in work or work-like settings based on the fact that her longest job was a year (Id.).[13]

In April 2002, Dr. Feitelson also completed a medical source statement form concerning Spinale's ability to perform work-related mental activities (Tr. 219-20). Dr. Feitelson noted that Spinale's ability to understand, remember and carry out instructions and to respond appropriately to supervisors, co-workers and work pressure were affected by her impairment but no other capabilities were affected (Id.). She felt that Spinale could carry out simple instructions and had only a moderate limitation in making judgments on simple work-related activities (Tr. 219).

---

[13] This is based on a false premise, as Spinale's two most recent jobs were as a homemaker for a year and a half and as a housekeeper for almost three years (Tr. 93, 100).

On August 30, 2001, Steven Spielman, Ph.D., a licensed psychologist, evaluated Spinale. Dr. Spielman noted that Spinale's affect was normal in range and her attention and concentration appeared within the normal limits, although her immediate verbal memory was mildly impaired (Tr. 187). She had a generally clear and coherent thought process with no evidence of loosening of associations, bizarre thought content, delusions or hallucinations (Id.). Dr. Spielman opined that Spinale might be susceptible to stress in certain situations where the demands on her are high and the job is fast paced (Tr. 188).

Michael Schneider, Psy.D., reviewed Spinale's medical records in September 2001, including records from SMHC and Dr. Spielman (Tr. 51), and prepared a psychiatric review technique form ("PRTF") based on those records (Tr. 205-18). Dr. Schneider concluded that the evidence indicated Spinale suffered from an affective disorder (Tr. 205, 208). He reported, however, that Spinale's condition resulted in only mild limitations in daily living activities, mild difficulty maintaining social functioning, mild difficulty in maintaining concentration, persistence and pace, and that Spinale had never had repeated episodes of decompensation of extended duration (Tr. 215).

-10-

## D. Testimony of Spinale and her Mother

At the hearing before the ALJ on April 22, 2002, Spinale testified that she had a hard time being around people and that she was easily agitated (Tr. 25). She stated that she could no longer lift anything because she had ruptured two discs when she was a CNA (Tr. 26). She had surgery to correct this problem in 1993, but now could only lift twenty pounds comfortably (Id.). Spinale reported that she left her last job as a homemaker because she was "emotionally a wreck" (Tr. 30), and that she did not believe she could work because her head was not "clear" and she could not "think straight" (Tr. 36). She did report recently babysitting a four year old for a friend for a few weeks, but stopped because she "couldn't deal with the child." (Tr. 36-37.)

Spinale's daily routine consists of her mother calling her in the morning to get her up, making breakfast for her seven year-old daughter, taking her daughter to school, and then returning home to clean or do nothing, depending on her mood (Tr. 34-35). She never goes shopping by herself because of her anxiety attacks, but usually goes with her mother (Id.).

Spinale's mother testified that she visits Spinale several times a week and speaks with her daily (Tr. 39). She calls

Spinale every morning to ensure that she gets up to take her daughter to school and not oversleep. She also stated that at times Spinale kept a very clean house and at other times left her home a complete mess (Tr. 40).

## E. Testimony of Vocational Expert

The vocational expert, Maurice Demers, reviewed the vocational evidence from the file and was present during Spinale's testimony at the hearing before the ALJ. He classified Spinale's past work as a nurse assistant as semi-skilled medium to heavy work; her work as a companion, cashier-checker and waitress, as semi-skilled light work; and her work as a housekeeper as unskilled light work (Tr. 44). He testified that if Spinale were limited to unskilled light or sedentary work that she would be precluded from performing her past relevant work except for her work as a maid (Id.).

## F. The ALJ's Decision

The ALJ, after evaluating the record, determined that: (1) Spinale was "not engaged in substantial gainful activity since the alleged onset of the disability"; (2) that her "mood disorder is a severe impairment"; (3) that "[t]his medically determinable impairment does not meet or medically equal one of the listed

-12-

impairments in Appendix 1, Subpart P, Regulation No. 4"; (4) that Spinale's "allegations regarding her limitations are not totally credible as they are not supported by the medical record"; (5) that the ALJ had "carefully considered all of the medical opinions in the record regarding the severity of [Spinale's] impairment"; (6) that she had a RFC for "light work with avoidance of interaction with the general public"; (7) that her "past relevant work as a maid did not require the performance of work-related activities precluded by her [RFC]"; and that her "disorder does not prevent [her] from performing her past relevant work as a maid, according to vocational expert testimony." (Tr. 17.) In arriving at this conclusion, the ALJ noted Dr. Feitelson's diagnosis of Spinale in the first paragraph of the January 11, 2002 letter. The ALJ, however, made no mention of Dr. Feitelson's opinion in the second paragraph of the same letter that Spinale's medical condition prevented her from working.

The ALJ also noted "that the record was left open after the hearing for a mental assessment by the claimant's therapist, but nothing was received." (Tr. 16.) This report, filled out by Dr. Feitelson January 28, 2002, was finally submitted after the ALJ's

-13-

decision was released (Tr. 246-49).

## II.  **STANDARD OF REVIEW**

Under the Social Security Act, the factual findings of the ALJ are conclusive if supported by "substantial evidence."  42 U.S.C. § 405(g); see also Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).  I must uphold the ALJ's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion."  Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  The ALJ's decision is therefore supported by substantial evidence if, given all the evidence, it is reasonable.  It is also the function of the ALJ, and not the courts, to determine issues of credibility, to draw inferences from the record evidence, and to resolve conflicts in the evidence.  Ortiz, 955 F.2d at 769.

The ALJ's findings of fact are not conclusive, however, "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  If the Commissioner, through the ALJ, has misapplied the law or failed to provide a fair hearing, deference to the Commissioner's decision is not appropriate, and

-14-

remand for further development of the record may be necessary. See Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001). I apply these standards to the arguments Spinale raises in her appeal.

### III.  ANALYSIS

Spinale argues the ALJ's ruling failed to consider or adequately explain the weight given to the medical opinions proffered by a treating medical source, Dr. Feitelson. Because I agree with Spinale that the ALJ failed to adequately discuss these medical opinions, I vacate and remand the case for further development of the record.

The First Circuit has made it clear that an ALJ's written decision need not directly address every piece of evidence in the administrative record.  See, e.g., Shaw v. Sec'y of Health & Human Servs., 25 F.3d 1037 (Table), 1994 WL 251000, at *5 (1st Cir. June 9, 1994) (per curium) ("We agree with the district court that while the ALJ did not expressly cite the agency doctor's reports (only the agency findings) he implicitly took them into account."); Rodriguez v. Sec'y of Health & Human Servs., 915 F.2d 1557 (Table), 1990 WL 152336, at *1 (1st Cir. Sept. 11, 1990) (per curiam) ("An ALJ is not required to expressly refer to each document in the record, piece-by-

piece."). Failing to address a specific piece of evidence will not undermine the validity of an ALJ's conclusion, for example, "when that conclusion was supported by citations to substantial medical evidence in the record and the unaddressed evidence was either cumulative of the evidence discussed by the ALJ or otherwise failed to support the claimant's position." Lord v. Apfel, 114 F. Supp. 2d 3, 13 (D.N.H. 2000) (citing Rodriquez, 915 F.2d 1557 (Table), 1990 WL 152336, at *1-4; Ortiz v. Apfel, 55 F. Supp. 2d 96, 103 & n.1 (D.P.R. 1999) (concluding that therapy notes made by psychiatrist, which were not discussed by the ALJ, did not appreciably support claimant's claim)).

The First Circuit, however, has also established that "an ALJ may not simply ignore relevant evidence, especially when that evidence supports a claimant's cause." Lord, 114 F. Supp. 2d at 13 (citing Nguyen, 172 F.3d at 35 (citing cases)). In order for an ALJ's decision to be supported by substantial evidence, it "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); see also Diaz v. Sec'y of Health & Human Servs., 791 F. Supp. 905, 912 (D.P.R. 1992). The ALJ failed to do so by rendering a decision referencing only the first paragraph in Dr.

Feitelson's letter dated January 11, 2002, describing Spinale's diagnosis and irritability, but omitting any indication of the second paragraph where Dr. Feitelson noted that Spinale's symptoms prevented her from working and would continue to do so for 12 months (Tr. 15, 183).

Dr. Feitelson's opinion as a treating physician is not controlling in this instance as it relates to the ultimate disability determination reserved to the Commissioner, see 20 C.F.R. § 404.1527(e)(1); Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991) ("The ALJ was not required to accept the conclusions of claimant's treating physicians on the ultimate issue of disability."), but "the SSA has instructed ALJs that a doctor's opinion as to whether a claimant is disabled 'must not be disregarded.'" Lord, 114 F. Supp. 2d at 15 (quoting S.S.R. 96-5p (1996)). The ALJ, moreover, must give "specific reasons for the weight given to the treating sources medical opinion," even if it is not controlling, as is the case here, and ultimately rejected by the ALJ. S.S.R. 96-2p (1996). By failing to mention Dr. Feitelson's opinion found in the second paragraph of the letter of January 11, "it is impossible to determine whether this evidence was considered and

implicitly discredited or instead was simply overlooked."[14]
Lord, 114 F. Supp. 2d at 14 (citing Cotter, 642 F.2d at 705
("[W]e need from the ALJ not only an expression of the evidence
s/he considered which supports the result, but also some
indication of the evidence which was rejected.  In the absence of
such an indication, the reviewing court cannot tell if
significant probative evidence was not credited or simply
ignored."); but see Shaw, 25 F.3d 1037 (Table), 1994 WL 251000,
at *5 (Court held ALJ implicitly considered doctor's reports and
stated "[w]hile we would prefer more explanatory detail, and the
new regulation contemplates greater detail, we see no reason to
return this case for the purely formulaic purpose of having the
ALJ write out what seems plain on a review of the record.")).

Even if the ALJ implicitly rejected this aspect of Dr.
Feitelson's opinion, the failure to explain the rejection
directly conflicts with the SSA's regulations, which provide that
"[w]e will always give good reasons in our notice of

---

[14] I do not find the ALJ's boilerplate language of having
"carefully considered all of the medical opinions in the record
regarding the severity of the claimant's impairment" to be
sufficient.  See, Cotter v. Harris, 642 F.2d 700, 707 n.10 (3d
Cir. 1981).

determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 404.1527(d)(2); see also Cotter, 642 F.2d at 707. "Accordingly, while the ALJ was entitled to find Dr. [Feitelson's January 11] letter unworthy of credit, she was not entitled to find it unworthy of comment." Lord, 114 F. Supp. 2d at 15-16.[15]

## IV. CONCLUSION

The ALJ failed to adequately address the weight given to the medical opinion of a treating medical source, Dr. Feitelson, found in the January 11, 2002 letter. While the ALJ acknowledged a portion of the letter, the ALJ never addressed in any way the portion of the letter in which Spinale's treating medical source opined about Spinale's medical condition and its impact on her ability to work. This was opinion evidence directly in support

---

[15] Spinale also argues that a January 28, 2002 report from Dr. Feitelson was not properly evaluated by the ALJ (Pl.'s Mot. for Order Reversing the Comm'r at 4; Tr. 246-49). This report was not submitted to the ALJ prior to the issuance of the ALJ's decision, in spite of the ALJ having left the record open after the hearing to allow for the report to be filed (Tr. 16). The ALJ, therefore, could not have evaluated the report before issuing the decision and it is not a part of the administrative record for which to base a remand upon. See, e.g., Cotter, 642 F.2d at 707 n.12. On remand the ALJ has the discretion to reopen the record and consider the report in question.

of Spinale's claim and must be addressed by the ALJ before being dismissed or ignored. For these reasons I grant Spinale's motion for an order reversing the decision of the Commissioner (Doc. No. 6) and deny the Commissioner's motion for an order affirming the decision of the Commissioner (Doc. No. 7). The ALJ's decision is vacated and remanded for further development of the record in line with this opinion.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

January 6, 2004

cc:  David Broderick, Esq.
     D. Lance Tillinghast, Esq.