**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. CC-17-1016-KuLTa |
| ANA BEATRIZ BETANCOURT, | Bk. No. 1:10-bk-14588-GM |
| Debtor. | Adv. No. 1:12-ap-01221-GM |
| ANA BEATRIZ BETANCOURT, | |
| Appellant, | |
| v. | **MEMORANDUM**[*] |
| MATTHEW BALLMER, | |
| Appellee. | |

Argued and Submitted on July 27, 2017
at Pasadena, California

Filed – August 14, 2017

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Geraldine Mund, Bankruptcy Judge, Presiding

Appearances:    Jeffrey D. Nadel argued for appellant; Derek L. Tabone argued for appellee.

Before: KURTZ, LAFFERTY and TAYLOR, Bankruptcy Judges.

---

[*]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

**INTRODUCTION**

On remand from this Panel, the bankruptcy court determined that chapter 7[1] debtor Ana Beatriz Betancourt's fraudulent transfer scheme caused plaintiff Matthew Ballmer's predecessor in interest to suffer an injury giving rise to a legally cognizable claim that could result in a money judgment. Based on this determination and others, the bankruptcy court held – for the second time – that Betancourt's debt to Matthew arose from "a willful and malicious injury to another entity" within the meaning of § 523(a)(6), and the bankruptcy court entered an amended judgment after remand in favor of Matthew.

Betancourt now appeals for the second time. As this Panel directed in its disposition of Betancourt's first appeal, the bankruptcy court duly identified a legally cognizable claim that could result in a money judgment in support of its § 523(a)(6) judgment. None of the points Betancourt raises on appeal justify reversal. Accordingly, we AFFIRM.

**FACTS**

Our prior decision, Betancourt v. Ballmer (In re Betancourt), 2015 WL 3500322 (Mem. Dec.) (9th Cir. BAP June 3, 2015), laid out the pertinent facts in great detail. We will revisit only those facts necessary to set the stage for this second decision.

Matthew is the son of Paul Ballmer and is the successor by

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. All "Civil Rule" references are to the Federal Rules of Civil Procedure.

2

assignment to Paul's interest in a judgment debt against La Fe, Inc. – Betancourt's wholly-owned corporation.[2] Paul obtained this judgment by default when neither Betancourt nor La Fe's counsel of record Robert Rein appeared for the duly scheduled trial set in Paul's contract action against La Fe.

Betancourt strenuously complained in the bankruptcy court that this state court judgment was unjust, but neither she nor Rein made any effort either to have it set aside or to appeal it. Instead, at the time of the December 2004 trial and immediately thereafter, Betancourt, her significant other, Calvin Larson, and Rein were busy perfecting a series of transfers that effectively stripped La Fe of its only assets: vacant land located in Topanga, California. In our prior decision, we generally identified this land as consisting of three parcels and referred to them as parcel 30-7, parcel 30-10 and parcel 27-29.

## A. Parcel 30-7

On behalf of La Fe, Betancourt conveyed parcel 30-7 from La Fe to Rein as an individual. The 30-7 grant deed was dated October 2, 2002, but was not recorded until July 2004, well after Paul had commenced his 2003 state court contract action.

Rein supposedly paid $200,000 cash for parcel 30-7, but the evidence in the record indicates that these funds never made it to La Fe. In fact, Betancourt admitted at trial that La Fe had no bank account in which to deposit any consideration paid.

---

[2]We refer to Matthew and Paul by their first names for the sake of clarity. No disrespect is intended.

3

**B.   Parcel 30-10**

Betancourt conveyed parcel 30-10 from La Fe to Rein's wholly owned corporation, Racada Corp.  Like the 30-7 deed, the 30-10 deed was dated October 2, 2002, and was executed by Betancourt on behalf of La Fe.  Unlike the 30-7 deed, the 30-10 deed was not recorded until December 20, 2004 – the week after Betancourt failed to appear for the state court trial.

The only "consideration" Racada ever gave for parcel 30-10 was a promise to pay $100,000 secured by a deed of trust naming **Larson** as the beneficiary.[3]  Whereas the 30-10 deed was dated October 2, 2002, the Racada deed of trust was not executed until December 10, 2004 (a few days before the state court trial) and was not recorded until December 20, 2004 (the same day as the 30-10 deed was recorded).  Neither Racada nor Rein ever made any payment on the missing note.  In February 2007, Rein executed, on behalf of Racada, an assignment of deed of trust purporting to assign the beneficial interest under the 30-10 deed of trust to Betancourt, even though the holder of the beneficial interest supposedly was Larson.  At the bankruptcy court trial held in December 2013, neither Betancourt nor Rein were able explain how Racada as the trustor could convey the beneficial interest in the 30-10 deed of trust from Larson to Betancourt.  Even so, Betancourt substituted in a new trustee in 2007, and in 2008 the new trustee executed a trustee's deed upon sale conveying title to Betancourt.  Betancourt is identified in the trustee's deed as

---

[3]It is not clear from the record who held the promissory note or who was named as payee in the promissory note.  The note apparently never was produced in discovery or presented at trial.

4

the foreclosing beneficiary for a credit bid of roughly $124,000 – the full amount of the debt Racada allegedly owed.

## C.   Parcel 27-29

On behalf of La Fe, Betancourt conveyed parcel 27-29 to Larson.[4]  The 27-29 grant deed is dated March 27, 1998, but was not recorded until December 20, 2004 – at the same time the 30-10 grant deed and trust deed were recorded.  Inexplicably, in October 1998 Larson recorded a deed of trust covering some of the same parcels.  The 27-29 deed of trust was dated February 15, 1992, was executed by Betancourt on behalf of La Fe and named Larson as beneficiary.  If Larson already owned parcel 27-29 per the 27-29 grant deed executed on March 27, 1998, why would Larson have needed to record in October 1998 the 27-29 deed of trust?

Betancourt's attempts to explain these transactions did not clarify matters.  At times she indicated that Larson really owned parcel 27-29; at other times she indicated that parcel 27-29 secured roughly $500,000 in "loans" Larson made, which enabled La Fe to purchase and pay some of the expenses of parcel 27-29; and at other times she indicated that Larson's $500,000 constituted a capital investment in La Fe.  Nor was Betancourt able to explain why, in December 2004, she executed and recorded a quitclaim deed conveying any interest she had as an individual in parcel 27-29 to Larson.

In 2007, Larson conveyed parcel 27-29 to Betancourt for no consideration.  Thus, the net effect of all of the transfer

---

[4]At least for property tax purposes, what we refer to as parcel 27-29 actually consists of multiple distinct parcels.

documents recorded between 2004 and 2008 was the transfer of all three parcels away from La Fe; parcels 30-10 and 27-29 ended up in Betancourt's hands – without her (or anyone else) having paid any consideration to La Fe for these transfers.

**D.   The Bankruptcy Court's First Decision And This Panel's First Decision**

Looking at the timing and nature of the above-referenced transactions, the bankruptcy court concluded after a one-day trial in December 2013 that Betancourt engaged in a "flurry of activity" in December 2004 to transfer out of La Fe all of its assets.  The bankruptcy court found that Betancourt undertook these actions for the specific purpose of preventing Paul from collecting from La Fe's assets any judgment he obtained.  The bankruptcy court further found that there was no evidence of any consideration paid by Larson for parcel 27-29.  With respect to parcel 30-10, the bankruptcy court found that La Fe did not receive any consideration for this property and that Rein had served as a "straw man" to enable Betancourt to strip this asset from La Fe.[5]

According to the bankruptcy court, the evidence demonstrated that, before Betancourt transferred them away, La Fe had equity in each of the above-referenced parcels: $200,000 in parcel 30-7; $100,000 in 30-10; and $100,000 in parcel 27-29.  Based on all of

[5]The bankruptcy court opined that parcel 30-7 was not part of Betancourt's scheme to denude La Fe of assets because the evidence demonstrated that Rein actually paid $200,000 for this property.  The bankruptcy court did not make any finding regarding the disposition of the $200,000 in sale proceeds, but it is fairly clear that La Fe never received them.

6

the above, the bankruptcy court held that Matthew had suffered a willful and malicious injury within the meaning of § 523(a)(6).

Betancourt appealed the bankruptcy court's December 2013 judgment, and this Panel issued a decision in June 2015 remanding the matter to the bankruptcy court for additional findings. Among other things, we said that the bankruptcy court needed to make a finding on Betancourt's subjective state of mind – whether she subjectively intended to injure Paul when she made the transfers described above.

In addition, we asked the bankruptcy court to make more specific findings regarding any injury resulting from Betancourt's actions, as follows:

(1)  if the injury was to Paul's property, identifying the specific property interest of Paul's that Betancourt injured by transferring away La Fe's assets;

(2)  if the injury was to Paul personally, identifying the "legally cognizable claim which could result in a monetary judgment" against Betancourt arising from the injury (citing Quarre v. Saylor (In re Saylor), 178 B.R. 209, 213-14 (9th Cir. BAP 1995), aff'd & adopted, 108 F.3d 219 (9th Cir. 1997)); and

(3)  a finding quantifying the injury resulting from Betancourt's conduct – and segregating the nondischargeable debt (if any) arising from Betancourt's willful and malicious property transfers from the dischargeable judgment debt arising from her breach of her contract with Paul.

**E.  Proceedings on Remand**

On remand, the bankruptcy court reviewed the evidence from

7

the December 2013 trial and gave the parties the opportunity to present new evidence. The only new evidence initially presented consisted of Betancourt's additional trial testimony. However, after presentation of the supplemental trial testimony, the bankruptcy court issued an order asking the parties to present evidence on two new issues: (1) when Paul and Matthew first actually discovered Betancourt's transfers of La Fe's assets; and (2) "when it would have been reasonable to discover the transfers."

In response to this order, Paul filed a declaration stating that he did not actually learn of the transfers until July 2011. Paul explained that he recorded an abstract of judgment in February 2005 and that he thought the resulting judgment lien against La Fe's real property eventually would result in the satisfaction of his judgment. Paul further explained that health issues prevented him from making any further judgment enforcement efforts until July 2011, when he discovered the transfers after conducting a routine title search.

In spite of the clear language in the bankruptcy court's February 2016 order directing both Paul and Matthew to file declarations, Matthew did not file any declaration. Betancourt filed her own declaration in response to Paul's declaration contending that, even if Paul did not actually know of the transfers, he reasonably should have known of them much earlier than 2011 – as all of them were evidenced by recorded documents in the public record. Betancourt further complained that, in contravention of the bankruptcy court's order, Matthew had not submitted a declaration and had not presented any evidence

8

regarding when he actually learned of the transfers or the reason why he had not discovered the transfers earlier.

Matthew filed a reply addressing the points made in Betancourt's declaration. Matthew essentially argued that Paul's declaration sufficed to address the issues raised by the bankruptcy court in its February 2016 order.

**F.   The Bankruptcy Court's First Decision On Remand**

Based on all of the above evidence, the bankruptcy court found that Betancourt carried out her scheme of transfers of La Fe's property with the intent to harm Paul by stripping La Fe of assets from which his judgment could be satisfied.

As for the issues regarding the nature and extent of Paul's injury, the bankruptcy court determined that there was no injury to any property interest of Paul's; however, according to the court, Paul was personally injured by Betancourt's scheme of transfers. And that injury, the bankruptcy court opined, constituted a legally cognizable claim which could result in a monetary judgment against Betancourt. Citing Cal Civ. Code § 3439.08(b)(1)[6] and <u>Murray v. Bammer (In re Bammer)</u>, 131 F.3d

---

[6]This section provides in relevant part:

> (1) Except as otherwise provided in this section, the creditor may recover judgment for the value of the asset transferred, as adjusted under subdivision (c), or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against the following:

> (A) The first transferee of the asset or the person for whose benefit the transfer was made.

(continued...)

9

788 (9th Cir. 1997), <u>abrogated in part on other grounds by</u>, <u>Kawaauhau v. Geiger</u>, 523 U.S. 57 (1998), the bankruptcy court posited that Betancourt would have transferee liability as a secondary transferee of the fraudulent transfers. By 2008, the bankruptcy court pointed out, Betancourt ended up holding legal title to both parcel 30-10 and parcel 27-29, and she did not qualify for the good faith transferee safe harbors set forth in § 3439.08(b)(1)(B).[7]

The bankruptcy court also determined the amount of the nondischargeable debt. Based on the value of parcels 30-10 and 27-29 ($100,000 each) and the amount of debt the Ballmers were prevented from collecting as a result of Betancourt's actually fraudulent transfers ($85,626), the bankruptcy court concluded that Matthew held a potential monetary claim for $85,626, plus interest, under Cal. Civ. Code §§ 3439.04(a)(1) and 3439.08(b)(2). According to the bankruptcy court, this claim arose from a willful and malicious injury within the meaning of § 523(a)(6).

But the bankruptcy court concluded that Matthew did not actually have a legally cognizable claim for monetary damages

[6](...continued)
        (B) An immediate or mediate transferee of the first
        transferee, other than either of the following:

        (i) A good faith transferee that took for value.

        (ii) An immediate or mediate good faith transferee of a
        person described in clause (i).

[7]Neither Betancourt nor Larson ever obtained title to parcel 30-7, so the bankruptcy court did not consider that parcel as part of its assessment of the injury to Paul.

10

that could be excepted from discharge under § 523(a)(6) given that the Ballmers had failed to demonstrate that their claim was not time barred under the applicable statute of limitations. Because the Ballmers sought to avail themselves of the "discovery rule" set forth in § 3439.09(a),[8] and because plaintiffs invoking this discovery rule bear the burden of proof to establish their entitlement to apply it, the bankruptcy court held that Matthew's failure to submit a declaration regarding when he actually discovered the transfers was fatal to both the fraudulent transfer claim and, in turn, his nondischargeability claim.[9]

**G.   Matthew's Motion For Relief From Judgment And The Bankruptcy Court's Amended Judgment On Remand**

After the bankruptcy court entered its judgment upon remand, Matthew filed a motion pursuant to Rules 9023 and 9024 seeking

_____

[8]This section provides in relevant part:

> A cause of action with respect to a transfer or obligation under this chapter is extinguished unless action is brought . . .
>
> (a) Under paragraph (1) of subdivision (a) of Section 3439.04, not later than four years after the transfer was made or the obligation was incurred or, if later, not later than one year after the transfer or obligation was or could reasonably have been discovered by the claimant.

[9]On the other hand, the bankruptcy court concluded that there was sufficient evidence in the record for it to conclude that neither of the Ballmers reasonably should have discovered the transfers (and their fraudulent nature) before Paul actually discovered them in 2011.  Thus, had Matthew filed a declaration establishing that he did not actually discover the the fraudulent transfers before Paul did, the Ballmers would have prevailed on the statute of limitations issue.

11

retrial or relief from judgment. Matthew asserted that his failure to file a declaration regarding when he actually discovered Betancourt's transfers was the result of his counsel's misreading of the bankruptcy court's order and had resulted in a miscarriage of justice. In his accompanying declaration, Matthew explained that he took the assignment of the judgment from his father in 2007 only because of his father's health issues and that the only knowledge he (Matthew) had regarding the subject transfers was the information he received from his father, which his father shared with him after he discovered the transfers in July 2011.

In her opposition to Matthew's motion, Betancourt argued that the language in the February 2016 order was more than clear regarding what evidence was necessary and that Matthew should not be permitted under either Rule 9023 or Rule 9024 to present evidence that was clearly available to him well before the court's decision and judgment.

The bankruptcy court held that Matthew was entitled to relief from judgment. Even though Matthew's motion did not focus on excusable neglect as a ground for relief, the bankruptcy court ruled that Matthew's counsel's excusable neglect supported the granting of relief under Civil Rule 60(b)(1) (which is made applicable in bankruptcy cases and adversary proceedings by Rule 9024). Applying the four factors from <u>Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.</u>, 507 U.S. 380, 395 (1993), the bankruptcy court concluded: (1) that the facts presented established excusable neglect; (2) that Matthew (belatedly) had established his lack of actual knowledge of the transfers; and

12

(3) that Matthew was entitled to an amended judgment against Betancourt excepting from discharge her debt in the amount of $85,626.73, plus interest, for a total of $101,850.49.

The bankruptcy court entered its amended judgment upon remand on January 12, 2017, and Betancourt timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I), and we have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1.  Did the bankruptcy court commit reversible error in finding that Betancourt acted with the subjective intent to injure Paul?

2.  Did the bankruptcy court commit reversible error in determining that Betancourt's willful and malicious conduct gave rise to the type of injury or claim that qualifies for nondischargeability under § 523(a)(6)?

3.  Did the bankruptcy court commit reversible error in granting Matthew's motion for relief from judgment?

## STANDARDS OF REVIEW

We review the bankruptcy court's intent findings under the clearly erroneous standard. See Ezra v. Seror (In re Ezra), 537 B.R. 924, 931 (9th Cir. BAP 2015). A bankruptcy court's factual findings are not clearly erroneous unless they are illogical, implausible or without support in the record. Id. at 930 (citing Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010).

The question regarding the types of injuries within the

13

scope of § 523(a)(6) hinges on our construction of federal and state law, which we review de novo. See Collect Access LLC v. Hernandez (In re Hernandez), 483 B.R. 713, 719 (9th Cir. BAP 2012).

Orders on motions for relief from judgment under Rule 9024 and Civil Rule 60(b) are reviewed for an abuse of discretion. Bateman v. U.S. Postal Serv., 231 F.3d 1220, 1223 (9th Cir. 2000); Morris v. Peralta (In re Peralta), 317 B.R. 381, 385 (9th Cir. BAP 2004).

The bankruptcy court abuses its discretion if it applies an incorrect legal standard or its factual findings are clearly erroneous. TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011) (citing United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)).

**DISCUSSION**

The general standards applicable to § 523(a)(6) are set forth in our prior Betancourt decision, and there is no need to go through them all again here.[10]  We will focus instead on Betancourt's contentions on appeal.

**A.    Intent Finding**

Betancourt, first, challenges the bankruptcy court's finding that she conducted the fraudulent transfers with the subjective intent to injure Paul.  An injury only is "willful" if the debtor subjectively intended to cause injury or "actually believed that

---

[10]Assignees of a debt, like Matthew, typically can pursue the same nondischargeability claims as would have been available to their assignor. See New Falls Corp. v. Boyajian (In re Boyajian), 367 B.R. 138, 145-48 (9th Cir. BAP 2007), aff'd, 564 F.3d 1088 (9th Cir. 2009).

14

injury was substantially certain to occur." In re Betancourt, 2015 WL 3500322, at *5 (citing Carrillo v. Su (In re Su), 290 F.3d 1140, 1144-45 (9th Cir. 2002)).

The bankruptcy court's intent finding was supported by ample evidence. The timing and nature of the transfer of La Fe's real property, first, away from La Fe and, later, into Betancourt's hands is suggestive of an intent to injure Paul. Moreover, the bankruptcy court found not credible Betancourt's attempts to offer alternate explanations for the transfers.

On appeal, Betancourt contends that, because Larson and Racada gave consideration for the transfers they received, she could not have made the transfers with the intent to injure Paul. As a preliminary matter, it is far from clear that either the so-called antecedent debt owed to Larson or Racada's note and deed of trust constituted any consideration to La Fe. The bankruptcy court found to the contrary, that La Fe received no consideration for the transfer of parcel 30-10 or for the transfer of parcel 27-29. And the record supports this finding.

But even if we were to hold that La Fe did receive some consideration, or received reasonably equivalent value, this would not justify reversal of the bankruptcy court's intent finding. The bankruptcy court's intent finding was based on the entirety of the circumstances and the presence or absence of consideration was only one of a number of factors the bankruptcy court considered. We cannot say that, given the nature and timing of Betancourt's transfers of La Fe's properties, the ostensible presence of some consideration precluded a finding that Betancourt subjectively intended to injure Paul.

15

Our analysis is bolstered by the law governing actually fraudulent transfers under Cal. Civ. Code § 3439.04(a)(1). The absence of reasonably equivalent value is not a prerequisite to finding that a debtor made a transfer with the actual intent to hinder, delay, or defraud her creditors. In re Ezra, 537 B.R. at 930 (citing Wolkowitz v. Beverly (In re Beverly), 374 B.R. 221, 235 (9th Cir. BAP 2007), aff'd in part and adopted, 551 F.3d 1092 (9th Cir. 2008)). Indeed, the presence or absence of reasonably equivalent value is just one of several factors courts typically consider when assessing whether the debtor had the requisite state of mind to commit an actual fraudulent transfer. See Cal. Civ. Code § 3439.04(b) (listing factors); see also In re Ezra, 537 B.R. at 930-31 (explaining that these factors – also known as badges of fraud – are not prerequisites and should not be applied formulaically).

In short, the bankruptcy court's intent finding was adequately supported by the record and the asserted presence of consideration for the subject transfers does not render the bankruptcy court's intent finding clearly erroneous.

**B.   Type Of Injury**

Our prior decision required the bankruptcy court, on remand, to determine whether the nature of the injury to Paul resulting from Betancourt's willful and malicious conduct would give rise to a legally cognizable claim for damages under California law. In re Betancourt, 2015 WL 3500322, at *7 (citing In re Saylor, 178 B.R. at 213-214). The bankruptcy court on remand duly determined that, as a result of her willful and malicious conduct, Betancourt had transferee liability under Cal Civ. Code

16

§ 3439.08(b)(1).

In making this determination, the bankruptcy court cited in support In re Bammer, 131 F.3d at 790. In Bammer, a son attempted to help his mother evade the consequences of her embezzlement by implementing a fraudulent transfer scheme designed to strip her of the remaining equity in her residence. Steven Bammer carried out this scheme by taking out a loan secured by a third mortgage against his mother's house. The Ninth Circuit court of appeals held that the injury caused by Steven Bammer's instigation and receipt of the fraudulent transfer was a willful and malicious injury that gave rise to a nondischargeable debt under § 523(a)(6).

Betancourt attacks on appeal the bankruptcy court's reliance on Bammer. Betancourt argues that Bammer is distinguishable because, unlike in Bammer, Larson and Racada gave consideration for the transfers of parcels 30-10 and 27-29. More specifically, Betancourt contends that, in light of the consideration La Fe allegedly received, no actionable injury to Paul occurred under the fraudulent transfer statutes.

As we explained above, however, the bankruptcy court found that La Fe received no consideration for the transfers, and the record supports this finding. Consequently, Betancourt's attempt to distinguish Bammer is unavailing.

In any event, the bankruptcy court's determination that Paul had a legally cognizable monetary claim against Betancourt under California law did not hinge on Bammer or on the presence or absence of consideration; instead, the determination hinged on Cal. Civ. Code § 3439.08(b)(1), which provides that the creditor

17

victimized by the fraudulent transfer "may recover judgment for the value of the asset transferred, or the amount necessary to satisfy the creditor's claim, whichever is less." Furthermore, Cal. Civ. Code § 3439.08(b)(1) permits the creditor to recover judgment against both immediate and mediate transferees, subject to certain safe harbors not applicable here. Simply put, this California fraudulent transfer statute established Paul's right to a monetary damages claim against Betancourt arising from her receipt of the fraudulently transferred property.

Betancourt alternately argues that there was no evidence in the record of the value of the transferred property and that she could not have any fraudulent transfer liability without evidence of such value. Under the above-referenced California statute, Cal. Civ. Code § 3439.08(b)(1), damages against the transferee are, indeed, limited to the value of the property transferred or the amount of the creditor's claim, whichever is less. However, as a factual matter, Betancourt's alternate argument lacks merit. The bankruptcy court found that, at the time of the transfer, La Fe had equity in each of the transferred parcels: $100,000 in 30-10 and $100,000 in parcel 27-29. And there was sufficient evidence in the record to support this finding. The aggregate value of these two properties – $200,000 – exceeded the amount Paul was owed, so the value of the properties did not limit the amount of Paul's monetary claim against Betancourt or the amount nondischargeable under § 523(a)(6).

In short, we reject all of Betancourt's theories on appeal attempting to explain why Paul did not suffer the type of injury

18

covered by § 523(a)(6).[11]

**C.    The Motion For Relief From Judgment And Application Of The Discovery Rule To The Fraudulent Transfer Claim**

Under Civil Rule 60(b)(1), a court may grant a party relief from judgment based on excusable neglect after considering all of the surrounding circumstances and ordinarily after focusing on the following four factors:

> (1) the danger of prejudice to the non-moving party, (2) the length of delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the moving party's conduct was in good faith.

Pincay v. Andrews, 389 F.3d 853, 855, 859 (9th Cir. 2004) (en banc) (citing Pioneer, 507 U.S. at 395); see also Briones v. Riviera Hotel & Casino, 116 F.3d 379, 381-82 (9th Cir. 1997) (applying Pioneer's four-factor test to Civil Rule 60(b) motion).

Here, the bankruptcy court duly applied the Pioneer four-factor test to determine that Matthew should be given relief from judgment and permitted to submit an additional declaration establishing his lack of actual knowledge of the fraudulent transfers until 2011, when his father advised him of the results of his routine title search.  Betancourt has not directly

---

[11]An injury only is actionable under § 523(a)(6) when it arises from conduct that is recognized as tortious under state law.  See Lockerby v. Sierra, 535 F.3d 1038, 1041 (9th Cir. 2008) (citing Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1206 (9th Cir. 2001).  At oral argument before this Panel, Betancourt acknowledged her concession in the bankruptcy court that an actual fraudulent transfer action under California law qualifies as an intentional tort.  Nor has Betancourt attempted to withdraw this concession on appeal.

19

challenged on appeal the bankruptcy court's specific Pioneer findings. Instead, she argues that, as a matter of law, Matthew's "mistake" was beyond the scope of Civil Rule 60(b) excusable neglect relief. As Betancourt put it, Matthew's counsel's noncompliance with the clear and unequivocal language of the bankruptcy court's order directing **both** Matthew and Paul to file additional evidence on the discovery rule issue "cannot be grounds to grant" a motion for relief based on excusable neglect. In support of this contention, Betancourt relies on Engleson v. Burlington Northern Railroad Co., 972 F.2d 1038 (9th Cir. 1992), but Betancourt's reliance on Engleson is misplaced. Engleson was decided before Pioneer. Subsequent to Pioneer, the Ninth Circuit has clarified that counsel error in responding to directives in court orders and rules is not per se excluded from excusable neglect relief. See Pincay, 389 F.3d at 859.

Betancourt also attempts to argue that the excusable neglect standard was inapplicable because Matthew did not demonstrate the existence of any neglect or error. Instead, Betancourt claims, Matthew made an affirmative strategic decision not to present into evidence his own declaration, and an intentional, calculated failure to present sufficient evidence in support of an issue on which Matthew bore the burden of proof is not the type of conduct that should be addressed by way of an excusable neglect motion.

We might have considered this argument more persuasive but for the unusual procedural history pertaining to the presentation of evidence on the discovery rule issue. Recall that the bankruptcy court issued an order after the close of evidence on remand raising the discovery rule issue and directing the parties

20

to present additional evidence. This order provided in part as follows:

> The parties will have a period of time to do discovery and present evidence of the date(s) when either of the Ballmers or their agents did or should reasonably have discovered the transfers. This can be by way of declaration, interrogatory, deposition, or other evidence. The Court will review the evidence and determine whether a further evidentiary hearing is required.

Order To Provide Further Evidence (February 16, 2016) at 4:5-10.

Based on this language and other language in its order, the bankruptcy court found that its order was ambiguous and that the ambiguity had caused Matthew's counsel to misinterpret what was required. The bankruptcy court further found, in terms of assessing the reason for Matthew's counsel's error, that it resulted from this misinterpretation – and not from any strategic decision to withhold evidence as Betancourt asserted. We cannot say that the bankruptcy court's findings regarding the reason for Matthew's counsel's error were clearly erroneous. Nor can we say that its other findings on the <u>Pioneer</u> factors – lack of prejudice to Betancourt, the limited amount of delay caused by Matthew's error and the Ballmers' good faith – were clearly erroneous.

Accordingly, the bankruptcy court did not abuse its discretion in granting Matthew's motion for relief based on excusable neglect.

Betancourt also challenges on appeal the bankruptcy court's determination that Matthew met his burden of proof to establish the applicability of the discovery rule in order to extend the fraudulent transfer statute of limitation. More specifically,

21

Betancourt challenges the bankruptcy court's finding that Matthew and his father Paul had acted diligently despite their failure to earlier discover the fraudulent nature of Betancourt's transfers. The bankruptcy court correctly found Matthew bore the burden of proof on this issue. See Samuels v. Mix, 22 Cal.4th 1, 10, 91 Cal. Rptr. 2d 273, 989 P.2d 701 (1999). "To successfully rely on the discovery rule, a plaintiff must prove (a) lack of knowledge; (b) lack of a means of obtaining knowledge (in the exercise of reasonable diligence the facts could not have been discovered at an earlier date); [and] (c) how and when he did actually discover the [claim]." Migliori v. Boeing N. Am., Inc., 114 F. Supp. 2d 976, 982 (C.D. Cal. 2000) (citations and internal quotation marks omitted).

Betancourt contends that the bankruptcy court erred when it held that, notwithstanding their obligation to exercise reasonable diligence, Matthew and Paul did not have reason to discover the fraudulent nature of the transfers until they actually did in July 2011 – nearly seven years after the December 2004 recordation of the conveyances transferring away La Fe's real property. In so holding, the bankruptcy court determined that the 2004 recordation of the conveyances did not put the Ballmers on constructive notice or give them actual knowledge of the fraudulent nature of the transfers. As a matter of California law, we agree with the bankruptcy court that the recordation did not put the Ballmers – as judgment creditors – on constructive notice. See Cal. Civ. Code § 1213 (stating that recordation only puts "subsequent purchasers and mortgagees" on constructive notice); cf. McCabe v. Grey, 20 Cal. 509, 516 (1862)

(construing predecessor statute and holding that "the only effect of recording a conveyance is to impart notice to subsequent purchasers and mortgagees.").

As a factual matter, there was nothing clearly erroneous about the bankruptcy court's finding that the Ballmers had acted in a reasonably diligent manner even though they failed to discover earlier the fraudulent nature of the transfers. As the court explained, the Ballmers, as judgment creditors, were not obliged to conduct any sort of inquiry into La Fe's real property assets or to aggressively attempt to enforce their judgment against La Fe. California law grants judgment creditors an initial right to enforce a judgment for a period of ten years, with an option to renew the judgment thereafter. See Cal. Civ. Proc. Code §§ 683.020; 683.110.

Moreover, it is not uncommon, in California, to simply record an abstract of judgment and then wait for the judgment debtor to attempt to sell or hypothecate his or her real property in order to collect on a judgment. See generally Cal. Prac. Guide Enf. J. & Debt §§ 6:150, et seq. (The Rutter Group eds. 2017) (describing numerous practical advantages of using a recorded abstract of judgment as a judgment enforcement device). As set forth in the record, Paul recorded an abstract of judgment shortly after he obtained the judgment against La Fe. On this record, the Ballmers were not required to do anything more in order to act diligently with respect to their judgment against La Fe.

Thus, we reject all of Betancourt's arguments related to the bankruptcy court's application of the discovery rule in favor of

23

Matthew. Given that none of Betancourt's arguments on appeal have any merit, we will AFFIRM.

**CONCLUSION**

For the reasons set forth above, the bankruptcy court's amended judgment on remand is AFFIRMED.